UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                          HON. MARK A. GOLDSMITH

v.                                                  Case No. 12-CR-20287-4

JOHNATHAN OLDHAM, D-4,

        Defendant.

_____/

## OPINION AND ORDER OVERRULING DEFENDANT'S OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

A jury returned a verdict against Defendant Johnathan Oldham on July 22, 2014, finding him guilty of the following crimes: (i) Racketeering (RICO) Conspiracy (Count One); (ii) Murder of Malachi Wilson in Aid of Racketeering (Count Ten); (iii) Use and Discharge of a Firearm During and in Relation to a Crime of Violence (Count Eleven); (iv) Distribution of Cocaine Base (Counts Thirteen, Fourteen, Fifteen, Nineteen, Twenty-One, and Twenty-Two); (v) Possession of a Firearm with an Obliterated Serial Number (Count Twenty-Six); (vi) Possession of an Unregistered Firearm (Count Twenty-Seven); (vii) Dealing in Firearms Without a License (Count Thirty-Three); (viii) Attempted Murder of EA (Efrem Anderson) in Aid of Racketeering (Count Thirty-Nine); and (ix) Use and Discharge of a Firearm During and in Relation to a Crime of Violence (Count Forty).

The Probation Department prepared a Presentence Investigation Report ("PSIR") for sentencing, to which Oldham prepared objections. The Probation Department and the

1

Government responded to Oldham's objections, see Gov't Resp. (Dkt. 765),[1] and Oldham filed a reply (Dkt. 768). The Court now addresses and overrules Oldham's unresolved objections.

## A. OBJECTION 1

Oldham first objects to the alias dates of birth listed in the identifying data portion of the PSIR. Oldham argues that if those dates appear in documents, they may be typographical errors.

The Court agrees with the Probation Department that even if Oldham has not used these alternative dates of birth himself, they are associated with him. These dates of birth are in documents in Oldham's juvenile records at the Genesee County Family Court. Oldham cites no authority suggesting that only those dates of birth that the defendant has claimed himself may be included in the PSIR, to the exclusion of other dates of birth that have been associated with the defendant by others, due to typographical errors or otherwise. Accordingly, the Court overrules this objection.

## B. Objection 3[2]

Oldham next objects to Paragraph 8 of the PSIR. Oldham denies that the "Howard Boys" — and other names by which certain individuals in the neighborhood were known — constituted a "gang." Oldham claims that the various names by which some people were identified over the years referred to them being from the same neighborhood, as opposed to an organization that "could qualify as a 'racket.'" Oldham Reply at 1. Oldham also highlights that the "gang" alleged by the Government had no rules, meetings, dues, hierarchy, or any other "earmark[] of an organized gang." Id.

---

[1] Neither Oldham's objections to the PSIR, nor the Probation Department's response, is filed publicly on the docket.

[2] Objection 2 was resolved before the PSIR was provided to the Court.

To the extent Oldham is disputing the PSIR's use of the word "gang," witnesses expressly identified the group as such, see X. Turner Vol. II at 82; T. Milhouse, 6/30/2014 (Rough Tr.) at 89-92, 99-102, 104, and the evidence of hand signs, tattoos, graffiti, drug sales, nicknames, and efforts to violently protect an exclusive territory support such a conclusion. Therefore, the use of the term "gang" in the PSIR was not improper.

To the extent Oldham is arguing that the Howard Boys were not an enterprise for purposes of RICO, but rather an unorganized group of individuals from the same neighborhood committing various, unrelated crimes, this argument is undermined by both the jury's verdict and the extensive testimony and evidence at trial. Indeed, the Court has repeatedly addressed this argument, including in its Memorandum Opinion Granting the Government's Motion for the Admission of Coconspirator Statements (Dkt. 784) and in its Opinion and Order Denying Defendants' Motions for Judgments of Acquittal (Dkt. 785).

Accordingly, the Court overrules this objection.

## C. OBJECTION 4

Oldham next objects to the statement in Paragraph 9 of the PSIR that "status was based on [the] commission of violent acts and drug sales." In his reply in support of his objections, Oldham clarifies that the terms "respect," "status," and "reputation" are not interchangeable. Oldham Reply at 1-2. Oldham argues, without citation to any authority, that the word "status" refers to rank in a group, whereas "respect" refers to an individual attribute. Id. Oldham also reasserts his argument that there was no group, and he suggests that there could be no status in light of the lack of hierarchy, rules, meetings or dues. Id. at 2.

The Court concludes that the term "status" used in Paragraph 9 of the PSIR refers to the regard or prestige with which Howard Boys members viewed each other, and does not, by

definition, necessarily involve a hierarchy of leadership. Oldham cites no authority in support of his implied argument that "status" cannot mean "reputation" because "status" requires some formalized hierarchy. To the contrary, as explained in the Court's Opinion and Order Denying Defendants' post-trial motions (Dkt. 786), "status" does not require a recognized hierarchy.

Oldham also cites no authority for his attempt to differentiate between the terms "respect," "reputation," and "status." The term "position," as used in the VICAR statute, includes a "social or official rank or status." See United States v. Whitten, 610 F.3d 168, 180 (2d Cir. 2010) (citing Webster's Third New International Dictionary Unabridged 1769 (Phillip B. Gove ed., Merriam-Webster 3d ed. 1986) (1961)). And a social rank or status fits within Webster's Dictionary's definition of "reputation" — "[T]he estimation in which one is generally held." See Webster's Third New International Dictionary Unabridged 1929 (Phillip B. Gove ed., Merriam-Webster 3d ed. 1986) (1961)). This same definition could also encompass "respect." To that end, according to Webster's New World Thesaurus, synonyms for "reputation" include "standing, prestige, stature, . . . respect, . . . [and] social approval." See also Roget's International Thesaurus § 912 (3d ed. 1962) (synonyms for "repute" include "respect" and "rank, standing, position, . . . [and] status").

Indeed, as numerous courts have explained, one can seek to increase his or her "reputation" among a subset of an enterprise and still meet VICAR's "position" motive requirement, regardless of an official hierarchical system. These cases often use both "status" and "reputation" in reaching this conclusion. See, e.g., United States v. Banks, 514 F.3d 959, 970 (9th Cir. 2008) (VICAR motive can be satisfied even if the defendant acted "out of concern for his status in the eyes of his 'little homies' within the gang, or his reputation among other gang members generally"); Whitten, 610 F.3d at 179-180 (highlighting testimony that a

reputation for violence enhanced one's status within the group, despite lack of "promot[ion] by grade in a ramified hierarchy"); United States v. Heilman, 377 F. App'x 157, 204-205 (3d Cir. 2010) (noting that acting to enhance one's "reputation generally or in the eyes of a specific faction or individual" is relevant for purposes of satisfying VICAR motive).

Therefore, the Court concludes that "status," "respect," and "reputation" — within the context of a neighborhood street gang like the Howard Boys — are not as distinguishable as Oldham suggests.

Furthermore, the use of the term is appropriate in light of the evidence presented at trial. There was testimony at trial that members would get more respect from other members based on how good they were at selling drugs and how dangerous (i.e., violent) they were. See X. Turner Vol. I at 33-34. Other former associates testified that a co-Defendant's reputation increased after he killed another individual; that co-Defendant became more "respected." C. Orr at 71. In other words, the more violent a reputation one had, the more respect that person earned and the greater status he enjoyed in the group. See R. Dudley Vol. II at 26 (failure to respond to acts of disrespect would result in being viewed as "soft" or "weak"). Accordingly, the Court overrules Oldham's objection based on the PSIR's use of the term "status."

D.  OBJECTION 5

Oldham next objects to the statement in Paragraph 10 of the PSIR that he was a member of a gang (the Howard Boys).

To the extent Oldham is arguing that the Howard Boys did not constitute a "gang," the Court addressed and rejected this same argument above. To the extent Oldham is claiming that he was not a member of the group, this argument is undermined by both the jury's verdict, as well as the substantial evidence at trial connecting Oldham to the group, including his own

5

recorded statements, his tattoos, his making the group's hand signs, testimony at trial identifying him as a member, his drug sales within the protected territory, and his violent acts in response to acts of disrespect against other members of the group. See X. Turner Vol. I at 43; Ex. 82; Ex. 51-1 to 51-3; Ex. 77; Ex. 81. The Court also addressed Oldham's membership in the group in its Memorandum Opinion Granting the Government's Motion for the Admission of Coconspirator Statements (Dkt. 784).

Accordingly, the Court overrules this objection.

### E.  OBJECTION 6

In his sixth objection, Oldham objects to the statements in Paragraph 19 of the PSIR that 400-700 kg of marijuana equivalent was attributable to the enterprise and was reasonably foreseeable to him, and that he should be responsible for 100 to 400 kg of marijuana equivalent. Oldham argues that "he and his co-Defendants were not part of an 'enterprise' and each acted individually, so that drug quantities should not be aggregated." See also Oldham Reply at 2 ("He and his co-Defendants were not part of a drug selling enterprise, and each acted individually. The Defendants were individual entrepreneurs, not co-conspirators.").

First, the Court notes that the drug distribution offenses had no effect on Oldham's total offense level, in light of the offense level calculation for the murder of Malachi Wilson. See PSIR, ¶¶ 52-58.

Second, both the jury's verdict and the evidence at trial undermine Oldham's argument that the group was not an enterprise or conspiracy that worked together. There was extensive testimony at trial that members of the group sold drugs, and that they worked together both to effectuate these drug sales (i.e., by warning one another of police and rival gang member presence, by sharing drugs and customers, and by taking turns selling), and to protect an

exclusive territory in which only members and associates could sell. See, e.g., X. Turner Vol. I at 93-96, 106-107, 110-112, 114; D. Scott Vol. I at 24-25; D. Scott Vol. II at 80-82; J. Wilson at 6; R. Dudley Vol. I at 6-7; B. Marshall Vol. II at 14; A. Patrick, 6/3/2014 (Rough Tr.) at 76-77. The fact that the sales proceeds may have been kept by individual member-sellers, rather than shared among the group, is irrelevant; Howard Boys members worked together to increase the individual participants' drug-sale income. Indeed, the PSIR goes on to specifically recognize that, "Each of the members sold drugs on their own, but . . . [s]ome had common sources for the drugs. They also fronted or sold drugs to each other." PSIR, ¶ 9. This statement is supported by the evidence, as described above.

Accordingly, the Court rejects Oldham's suggestion that each of the Defendants worked independently, and that the drug quantities consequently should not be aggregated.

Regarding the amount of drugs for which Oldham is being held accountable, the Court finds that the amount stated in the PSIR — at least 100, but less than 400 kilograms of marijuana equivalency, see PSIR, ¶ 19 — is supported by the evidence. Under the Sentencing Guidelines' drug equivalency table, at least 100 kilograms of marijuana translates to approximately 28.01 grams of cocaine base. See U.S.S.G. § 2D1.1, Application Note 8(D) (setting forth the drug equivalency table for converting 1 gram of cocaine base to 3,571 grams of marijuana, or, equivalently, 28.01 grams of cocaine base to over 100 kilograms of marijuana). This amount is supported by the evidence.

First, evidence and testimony established that Oldham sold 7.48 grams of cocaine base to an undercover officer in the area over the course of less than one month in 2009. Exs. 432, 438, 442, 447, 452, 457; see also D. Harris, 7/3/2014 (Rough Tr.) at 79-106.

7

Second, Xavier Turner testified that he did "five off the dub" transactions with Oldham on approximately 50 occasions. See X. Turner Vol. I at 108. Turner testified that a "five off the dub" transaction occurred when an individual would provide drugs to a seller who had a customer but no drugs, in exchange for $15 of the $20 received. See id. at 106-107. And Scott Nedoff, a special agent for the Drug Enforcement Administration, testified that the typical amount a street dealer will sell to a user is a $20 rock, which equates to approximately .1 grams of crack cocaine. See S. Nedoff, 7/3/2014 (Rough Tr.) at 21; see also S. Rust, 6/25/2014 (Rough Tr.) at 183. But see A. Golfin at 8 (testifying that a $20 rock is approximately .2 grams). Therefore, even conservatively assuming that each five-off-the-dub transaction resulted in only .1 grams being sold, this equates to an additional 5 grams of cocaine base, or 12.48 grams when combined with the undercover sales discussed above.

Third, witnesses testified to having observed Oldham selling drugs in the neighborhood. See T. Milhouse, 6/30/2014 (Rough Tr.) at 107; C. Orr at 66. Xavier Turner described having hung out and sold drugs with Oldham for many years. X. Turner Vol. I at 47. In addition, Oldham described carrying weapons while drug dealing for protection, suggesting that he had experience with drug sales. Ex. 82. As described above, there also was testimony regarding how members — including Oldham — would help each other with drug sales, such as by warning of police presence or taking turns selling so as not to compete for customers. See X. Turner Vol. 114. Furthermore, there was extensive testimony and evidence regarding Oldham committing violent acts, which worked to protect an exclusive territory from which he and the other members and associates of the group could be exclusive drug sellers. And there was testimony that members were in that territory selling drugs every day. See X. Turner Vol. I at 105-106; see

8

also U.S.S.G. § 1B1.3(a)(1)(B). Accordingly, it is proper for the Court to consider additional drug sales by Oldham and other members in calculating the drug quantity attributable to Oldham.

Based on the above facts, it is reasonable to conclude that the additional 15.53 grams of cocaine base[3] needed to cross the 28.01-gram threshold are attributable to Oldham, either as additional direct sales himself or sales by coconspirators that were reasonably foreseeable to him. See U.S.S.G. § 1B1.3(a)(1)(B); See United States v. Anderson, Jr., -- F. App'x --, 2015 WL 728044, at *4 (6th Cir. Feb. 19, 2015) ("Where the exact amount of drugs involved is unclear, the district court is permitted at sentencing to approximate the quantity of drugs attributable to a defendant, while taking care to err on the side of caution." (quotation marks and citation omitted)); U.S.S.G. § 2D1.1, Application Note 5 ("Where . . . the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, . . . [and] similar transactions in controlled substances by the defendant."). The evidence establishing Oldham's familiarity with drug sales, combined with (i) the length of time Oldham sold in the area, (ii) the amount of the established sales, (iii) Oldham's assistance with other coconspirator's sales, (iv) his work to protect an exclusive territory in which to sell, and (v) testimony that group members sold drugs in the territory every day, make it reasonable (and indeed, conservative) to find that Oldham sold at least 15.53 additional grams of cocaine base in the exclusive territory. This equates to less than one $20 rock — weighing approximately .1 grams — every other day for one year. And, as noted above, Oldham's six sales to the undercover agent between September and October 2009 alone — totaling 7.48 grams — translated to much more than .1 grams every other day, thereby suggesting that Oldham's

---

[3] The 28.01 grams of cocaine base needed under the drug equivalency table, less the 12.48 grams described above for the undercover sales and five-off-the-dub transactions.

average sales over his many years of drug sales exceeded this amount. Further, even if Oldham did not make these sales himself, there was sufficient evidence that he assisted his coconspirators with their constant sales, thereby permitting these amounts to be attributed to him as well.

All the evidence taken together leads the Court to conclude, by a preponderance of the evidence, that Oldham is appropriately (and conservatively) responsible for over 28 grams of cocaine base. Accordingly, the Court overrules this objection.

### F. OBJECTION 7

Lastly, Oldham objects to the inclusion of the information in Paragraphs 69-76 of the PSIR, because they describe Oldham's prior contact with law enforcement that did not result in convictions. Without citing any authority, Oldham argues that these paragraphs should be stricken from the PSIR.

The Court agrees with the Probation Department that this information is properly included in the PSIR. Pursuant to 18 U.S.C. § 3661 and United States Sentencing Guideline § 1B1.4, the Court may consider any information concerning the background, character, and conduct of the Defendant in imposing a sentence, unless otherwise prohibited by law. Indeed, numerous courts — including the Sixth Circuit — have concluded that consideration of uncharged offenses, dismissed prosecutions, or even acquittals may be relevant for purposes of sentencing. See United States v. Haj-Hamed, 549 F.3d 1020, 1026 (6th Cir. 2008) ("In general, a district court can consider uncharged or dismissed conduct for sentencing purposes."); State v. Thomas, 29 F. App'x 241, 251 (6th Cir. 2002) ("[C]ourts have consistently held that uncharged but relevant criminal conduct may be used in determining a defendant's sentencing guideline range."); United States v. Graves, 785 F.2d 870, 872, 876 (10th Cir. 1986) (both the sentencing court and the post-sentencing administrative agencies are, "of course, limited to a consideration

of information that is accurate, but they are not precluded from considering prior charges that were dismissed or alleged offenses from which charges were not filed because of illegally obtained evidence").

Oldham does not dispute the accuracy of Paragraphs 69-76, and these paragraphs explicitly state that the cases were dismissed (Paragraphs 69, 71-72, 75-76) or that the conduct was not prosecuted (Paragraphs 70, 73-74). Nor does Oldham claim that these paragraphs are prohibited from being included in the PSIR by some statute, regulation, or other authority. Further, these paragraphs were not used in calculating the sentencing guidelines; they merely serve informational purposes. Accordingly, the Court overrules this objection.

SO ORDERED.

Dated: May 18, 2015     s/Mark A. Goldsmith
       Detroit, Michigan     MARK A. GOLDSMITH
                                       United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 18, 2015.

                                         s/Johnetta M. Curry-Williams
                                         Case Manager